UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-09-139-B-W |
| | ) | |
| NATHAN LAWRENCE REHLANDER | ) | |

**AMENDED[1] ORDER ON DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Plaintiff contends that emergency hospitalization for a mental illness cannot qualify as "committed to a mental institution" for purposes of 18 U.S.C. § 922(g)(4) when formal involuntary commitment is later found unnecessary without violating the Fifth and the Second Amendments. The Court has recently considered and rejected similar arguments in *United States v. Brian Murphy*, CR-09-157-B-W and *United States v. Benjamin Small*, CR-09-184-B-W and does so again here.

**I.    STATEMENT OF FACTS**

On March 28, 2007, and continued on April 2, 2007, Nathan Rehlander was involuntarily hospitalized at Acadia Hospital after self-reporting a suicide attempt. *Application for Emergency Involuntary Admission to a Mental Hospital* Attach. 1 (Docket # 37); *Discharge/Transfer Summary from Acadia Hospital* Attach. 3 (Docket # 37). Both times, consistent with Maine law, three steps were taken to ensure Mr. Rehlander needed hospitalization. 34-B M.R.S.A. § 3863.

For the March 28 hospitalization, a crisis clinician filled-out and signed an application for emergency committal or "blue paper,"[2] describing why she believed Mr. Rehlander was mentally

---

[1] This Amended Order corrects two typographical errors in the Order on Defendant's Motion to Dismiss Indictment dated February 18, 2010 (Docket # 45). In the first paragraph of page 3 of that Order, the dates of April 5, 2009 and April 13, 2009 should be April 5, 2007 and April 13, 2007.
[2] "Blue paper" is the short hand parlance for emergency involuntary admission applications in Maine because historically the three part forms were printed on blue paper. *United States v. Smith*, 511 F.3d 77, 79 n.1 (1st Cir. 2007) (citing *United States v. Flanders*, Crim. No. 03-76-B-W, 2004 WL 444027, at *2 n.1 (D. Me. Mar. 4, 2004)).

ill and posed a likelihood of serious harm.  She stated "client has plan to hang himself, client has diagnosis of bipolar and paranoid schiz, is distrustful of treatment and of medication." *Application for Emergency Involuntary Admission to a Mental Hospital* Attach. 1.  A nurse practitioner certified that he examined Mr. Rehlander on the date of the certification and agreed that Mr. Rehlander was mentally ill and posed a likelihood of serious harm because he had a "plan to kill himself by hanging." *Id*.  A judicial officer, here a Justice of the Peace, certified that the application complied with Maine law.  *Id*.[3]

At some point, Mr. Rehlander appears to have briefly switched from involuntary to voluntary commitment.  *Tr.* Attach. 5 at 6:1-7, 21:2-21 (Docket # 37).[4]  He was switched back to involuntary hospitalization on April 2 when a licensed clinical social worker filled-out and signed an application for emergency committal.  *Application for Emergency Involuntary Admission to a Mental Hospital* Attach. 2 (Docket # 37).  She certified that Mr. Rehlander posed a likelihood of serious harm because of "increased grandiosity; disorganized thoughts; placing self and others in harm's way in imminent manner, delusional."  *Id*.  A doctor certified that he examined Mr. Rehlander on the date of the certification and agreed that Mr. Rehlander was mentally ill and posed a likelihood of serious harm.  He identified Mr. Rehlander's symptoms as "elevated mood, pressured speech, distractability, fight of ideas" and stated that Mr. Rehlander posed a substantial risk of physical harm because "five days ago, patient made a suicidal gesture, hanging self from belt."  *Id*.  Once again a Justice of the Peace certified that the application

---

[3] Maine law requires that a physician or psychologist examine the patient within 24 hours of admission.  Either the patient is again certified as suffering from a mental illness and posing a likelihood of serious harm or the patient is immediately discharged.  § 3863(7).  The record does not contain any information about this second certification.

[4] Dr. Tingley testified that Mr. Rehlander went from "involuntary to voluntary back to involuntary."  *Tr.* at 6:5.  Mr. Rehlander testified that "if I remember correctly, it was Monday that I switched to voluntary and the next day . . . I was switched to involuntary."  *Id*. at 23:14-17.  However, Monday was April 2, 2007, the same day Mr. Rehlander's second involuntary admission was approved.

complied with Maine law.  Dr. Rana Dagher, a doctor at Acadia, recertified within 24 hours of his second admission that Mr. Rehlander was a danger to himself and others.  *Tr*. at 14:19-23.

On April 5, 2007, the state of Maine notified Mr. Rehlander of an application for involuntary commitment pursuant to 34-B M.R.S.A. § 3864 and that a hearing would be held on April 13, 2007.  *Notice of Hearing, Order to Examine and Appointment of Counsel* Attach. 4 (Docket # 37).  Mr. Rehlander was also notified that Carol Coakly was appointed to represent him during the hearing and that Dr. Charles Tingley and Dr. Robert Gallon were appointed to examine him and submit a written report to the court before the hearing.

At the hearing, the Maine district judge heard testimony from Dr. Tingly, Dr. Gallon, Dr. Dagher, Mr. Rehlander, and Mr. Rehlander's mother.[5]  The judge concluded, "I think that—that the doctor's on point that—that he should be treated, but I don't see a likelihood of serious harm by clear and convincing evidence.  So, I'm going to order that he be discharged."  *Tr*. at 33:2-5.

On November 28, 2008 Mr. Rehlander purchased a gun and on December 13, 2008, the police were called when Mr. Rehlander displayed it in public.  On September 9, 2009, Mr. Rehlander was indicted under 18 U.S.C. § 922(g)(4) for possession of a gun by someone "who has been committed to a mental institution."  *Indictment* (Docket # 1).  Mr. Rehlander's sole commitments were the two emergency hospitalizations in March and April 2007.

On January 11, 2010, Mr. Rehlander moved to dismiss the indictment under both the Second and Fifth Amendments.  *Def.'s Mot. to Dismiss* (Docket # 37) (*Mot. to Dismiss*).  The Government responded on February 1, 2010.  *Gov't's Resp. to Def.'s Mot. to Dismiss* (Docket #

---

[5] Dr. Tingley testified that "[Mr. Rehlander] had a plan to hang himself with a belt but did not try it" and that "since the time [of the suicide plan] he has a better grasp on those particular stressors."  *Tr*. at 4:10-22.  Dr. Gallon testified that Mr. Rehlander had a lot of stressful things that occurred that "cause[d] him to finally snap" but that he believed the self-reported suicide attempt was unserious and meant only to "provoke 9-1-1 and manipulate, get everybody worked up."  *Id*. at 10:2-25.  Dr. Dagher testified that since Mr. Rehlander's initial suicide attempt that precipitated admission to the hospital, "Mr. Rehlander has not—has not voiced any suicidal ideation—since admission."  *Id*. at 14:1-5.  Mr. Rehlander testified that the stress at school and his apartment that caused his hospitalization was no longer a problem, although the prolonged hospital stay had led to other stress.  *Id.* at 19:1-25.

3

43). Mr. Rehlander replied to the Government on February 16, 2010. *Def.'s Reply to Gov't's Resp. to Def.'s Mot. to Dismiss* (Docket # 44) (*Def.'s Reply*).

## II.  DISCUSSION

18 U.S.C. § 922(g)(4) prohibits the possession of a firearm by persons "who have been committed to a mental institution." Mr. Rehlander argues that finding him "committed" for purposes of § 922(g)(4) violates his rights under the Fifth and Second Amendments. For his Fifth Amendment argument, Mr. Rehlander contends that "[b]ecause a "blue paper" in Maine does not provide the procedures needed to comply with the Due Process Clause, basing the instant prosecution on a procedure that was neither intended to, nor would be recognized as a valid method of "commitment" to a mental hospital, renders the term meaningless" and therefore unconstitutionally vague. *Mot. to Dismiss* at 13. Mr. Rehlander also argues that counting his emergency hospitalization as a commitment under § 922(g)(4) infringes on his Second Amendment right to bear arms "[u]nless the Government can produce evidence that those who are *not* committed after an opportunity to be heard before a neutral factfinder present the same danger as those who are." *Id*. at 16. This Court addressed and rejected both arguments in *United States v. Brian Murphy*, CR-09-157-B-W (*Order*) and again in *United States v. Benjamin Small*, CR-09-184-B-W, and by reference, the Court incorporates in this opinion its reasoning in both *Murphy* and *Small*.

> Mr. Rehlander seeks to distinguish his case on the facts:
>
> Mr. Rehlander's emergency admissions in March and April of 2007 were based on a diagnosis of a mental illness that led to the threat of self-harm. Later evaluations indicated that Mr. Rehlander was not suffering from a mental illness and that his verbal statements, unaccompanied by any accompanying acts, did not present evidence of self-harm. A judicial officer credited this testimony to the extent that it found that the State had not carried its burden of proving an adequate basis for an involuntary commitment.

*Def.'s Reply* at 5.  Mr. Rehlander asks the Court to carve out "some exception to treating a 'blue paper' as a conclusive commitment where that 'blue paper' has been successfully challenged." *Id*. at 5-6.

The Court does not reach the substance of Mr. Rehlander's argument because it disagrees with his premise: that he has successfully challenged his blue paper commitment.  The issue addressed by the judge at the April 13 hearing was not whether the emergency commitment was justified but whether Mr. Rehlander posed a likelihood of serious harm to justify "*continued* hospitalization."  *Tr*. at 35:1 (emphasis added).[6]

Mr. Rehlander's experience is comparable to Mr. Murphy's.  Mr. Murphy was temporarily hospitalized, the hospital moved for involuntary commitment, but before the hearing, the hospital withdrew its motion explaining, "the said patient may be discharged from involuntary hospitalization with safety."  *Order* at 2.  Here, although a judge, not the hospital, decided that continued involuntary commitment was unnecessary, there has been no suggestion that the initial emergency admission was inappropriate.  For the same reasons set forth in *Murphy*, the Court finds that section 922(g)(4) adequately put Mr. Rehlander on notice that "commitment to a mental institution" would include his emergency hospitalization under Maine law and the law violates neither the Fifth nor Second Amendments.

### III.   CONCLUSION

The Court DENIES Mr. Rehlander's Motion to Dismiss (Docket # 37).

---

[6] The trial testimony indicates that initial emergency hospitalization was necessary.  Two of the three doctors concluded that Mr. Rehlander had been close to a suicide attempt, and Dr. Gallon, who questioned whether Mr. Rehlander reported his suicide attempt for attention, did not question the need for the initial hospitalization.  Dr. Gallon and Mr. Rehlander both testified that much of the stress that caused Mr. Rehlander to initially snap had been resolved—suggesting that although initial hospitalization was arguably appropriate, it was no longer necessary.

To the extent Mr. Rehlander would respond that the witnesses did not address the question, that is precisely the point.  Notwithstanding Mr. Rehlander's speculation about the possible outcome, the issue was neither raised nor addressed.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of April, 2010